Filed 6/20/16  Bohbot v. Foerster CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| MERCEDES BOHBOT, | B265563 |
| Plaintiff and Appellant, | (Los Angeles County |
| v. | Super. Ct. No. BC475611) |
| MONIQUE FOERSTER, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Marc Marmaro, Judge.  Affirmed.

Engstrom, Lipscomb & Lack, Walter J. Lack, Eric R. Bell, Robert T. Bryson and Michael P. Lewis for Plaintiff and Appellant.

Monique Foerster, in pro. per., for Defendant and Respondent.

Mercedes Bohbot (Mercedes) appeals from a judgment dismissing a malicious prosecution action against her former daughter-in-law, respondent Monique Foerster, formerly Monique Bohbot (Monique).[1] The malicious prosecution action arose out of a marital dissolution action filed over 28 years ago by Monique against her ex-husband and Mercedes's son, Jeff Bohbot (Jeff). That dissolution action has been the subject of four appeals.[2] In *Bohbot I*, the appellate court found that Jeff's failure to disclose the existence of certain trademarks associated with a line of clothing developed during the marriage constituted extrinsic fraud. (*Bohbot I*, at p. 13; 2001 WL 1471725, at p. *6.) The court remanded the matter to the trial court with instructions to grant Monique's motion to set aside the stipulated property division, and "redetermine the value of the entire community estate as of a date to be determined . . . and divide the property." (*Ibid*.)

Following remand, Monique joined Mercedes to the action and proceeded to file a series of amended complaints against her. The sole surviving claim at issue pled in the operative third amended complaint (TAC), alleges violation of the

---

**1** For the sake of clarity, we refer to individuals who are or once were members of the Bohbot family by their first names.

**2** They are: *In re Marriage of Bohbot* (Nov. 20, 2001, B141631) [nonpub. opn.][2001 WL 1471725] (*Bohbot I*); *In re Marriage of Bohbot* (Jan. 26, 2005, B171676) [nonpub. opn.] [2005 WL 237234 ](*Bohbot II*); *In re the Marriage of Bohbot* (Oct. 18, 2007, B185818) [nonpub. opn.] [2007 WL 3026428] (*Bohbot III*); and *In re Marriage of Bohbot* (Oct. 20, 2010, B214035) [nonpub. opn.] [2010 WL 4108439] (*Bohbot IV*].) In addition to the record we draw the operative facts from these prior opinions, of which we take judicial notice.

Uniform Fraudulent Transfer Act, Civil Code section 3439 et seq. (UFTA). *Bohbot IV*, at pp. 8-15; 2010 WL 4108439, at pp. *4-7.)

In September 2008, the trial court granted Mercedes's motion to dismiss and/or for judgment on the TAC. In December 2011, Mercedes filed the instant action for malicious prosecution against Monique. The court bifurcated and tried the issue of probable cause first. After extensive briefing and oral argument, the court found that Mercedes failed to establish that Monique lacked probable cause to sue or maintain a suit against Mercedes, and entered judgment against Mercedes. On appeal, Mercedes contends the court's ruling lacks sufficient evidentiary support, and that Monique concedes that her action against Mercedes was premised on fraudulent misrepresentations and is devoid of probable cause. We conclude otherwise, and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Although the sole issue on appeal is whether Monique lacked probable cause to sue Mercedes, an understanding of the complex background of the litigation involving Monique, Jeff and others is necessary to establish a backdrop for the instant action and place the probable cause issue in context.

*Jeff's Fraudulent Business Venture with Albert Elkouby During the Marriage*

Jeff and Monique married in 1976 and had four children. Monique filed a petition for dissolution in 1988. (*Bohbot II, supra*, 2005 WL 237234, at p. *1.) During the marriage, Jeff, who began designing jackets as part of the "Guess" line, was the sole shareholder and president of Jeff Hamilton, lnc. (JHI), and designed a clothing line under the "Jeff Hamilton" label. Between 1985 and 1987, JHI registered four trademarks associated with the Jeff Hamilton line (the original Jeff

3

Hamilton trademarks), none of which was disclosed to Monique during the marriage.

In 1987, Jeff was involved in the creation and incorporation of JH Design Group, Inc. (JH Design), which also designed and marketed clothing under the Jeff Hamilton label. Although Albert Elkouby was JH Design's sole shareholder of record, he had a secret, unwritten agreement with Jeff by which Jeff retained a half-ownership interest in JH Design. (*Bohbot I, supra*, at pp. 4, 7; 2001 WL 1471725, at p. *2-3.) In February 1988, Jeff caused JHI to assign its four original trademarks to him, which he then licensed to JH Design.

After Monique filed a petition to dissolve the marriage in April 1988, she filed a motion to join JH Design and Elkouby as parties to the dissolution action on the ground that they controlled assets in which the community had an interest. In December 1989, Jeff filed a declaration in the divorce proceeding stating unequivocally that he did "not own an interest in the business known as [JH Design]." In February 1990, Monique, Jeff, JH Design and Elkouby entered into a settlement agreement which the trial court entered in April 1990 as a stipulated dissolution judgment.

*Jeff Sues Elkouby*

In 1993, Jeff sued Elkouby and JH Design (the *Elkouby* action). Jeff alleged that, in November 1987, he contributed over $500,000 in merchandise and assets, plus his business expertise, in exchange for a one-half ownership interest in JH Design and its stock shares which were to be held in Elkouby's name. Jeff filed a declaration in the *Elkouby* action stating that he and Elkouby had agreed that, although the JH Design stock would be held in Elkouby's name, they remained equal co-owners of JH Design. Jeff also declared that he personally owned the

4

four original Jeff Hamilton trademarks that JH Design had used pursuant to a license agreement. Jeff had not identified those four trademarks as community property in his divorce action. In February 1994, Monique submitted a declaration in the *Elkouby* action stating that: "Although Jeff and I had very difficult times during our divorce, we were finally able to come to a settlement in 1990. When we made our agreement, the amount of money I was to be paid by Jeff was arrived at by considering many things. . . . Jeff and I discussed that he was half owner of [JH Design], but also that it was a new business and that any value it had was developed after the time that we separated."

Jeff and Elkouby settled the *Elkouby* action in January 1997 for $1 million.

*Jeff Assigns Trademarks to his Mother*

In August 1993, Jeff started J.D.I. Industries, Inc. (later changed to Jeff Hamilton Industries, Inc., (JHI)). Jeff was president of JHI and Mercedes was its sole shareholder, purportedly because her money had been used to form the corporation.

In July 1994, Jeff applied for three trademarks associated with his clothing line, which eventually matured into registered trademarks. In August 1994, as president of JHI, Jeff assigned seven trademarks to Mercedes (three of the four original Jeff Hamilton trademarks, plus four new trademarks).[3]

---

[3] The record is unclear as to when or how the new trademarks originated or how JHI came to own them.

*The Stipulated Property Division and Dissolution Judgment is Set Aside*

In August 1999, Monique moved to set aside the couple's 1990 stipulated judgment. She asserted that Jeff committed extrinsic fraud by, among other things, lying about his ownership interest in JH Design. The trial court denied the motion. Monique appealed.

In November 2001, Division Three of this court issued its decision in *Bohbot I* reversing the order denying the motion to set aside the stipulated judgment. The court found that certain trademarks associated with Jeff's clothing line were community property and that his failure to disclose the existence of those assets constituted extrinsic fraud. (*Bohbot I, supra*, at pp. 12-13; 2001 WL 1471725 at p. *6.) The appellate court found the trial court erred when it denied the motion to set aside the judgment because: "the evidence does not support [the trial court's] conclusion that Jeff disclosed the existence of a community interest in the trademarks or that Monique was aware of those community assets. Jeff's only evidence that Monique was aware of the trademarks as a community asset [was] his December 1999 declaration that the trademarks appeared on clothing manufactured by [Jeff Hamilton] that Monique saw during the marriage. Her observation of the trademarks on clothing during the marriage would not reveal the falsity of Jeff's December 1989 declaration that he had given her all the money that he could salvage from the businesses or the falsity of his representations that [Jeff Hamilton] was a complete financial failure and had no assets and that he was starting anew with JH Design." (*Bohbot I, supra*, at p. 11; 2001 WL 1471725 at p. *5.)

The matter was remanded to the trial court with directions to grant Monique's motion, set aside the stipulated property division and judgment,

6

redetermine the value of the community estate as of a date to be determined and divide the property. (*Bohbot I, supra*, at p. 13; 2001 WL 1471725 at p. *6.)

*Monique Joins Mercedes to the Dissolution Action*

In July 2002, following remand, Monique filed a complaint for joinder against Mercedes asserting a cause of action for accounting, and seeking declaratory relief and imposition of a constructive trust. Monique alleged that the four original Jeff Hamilton and/or new trademarks Jeff had assigned to his mother in 1994 were community property assets "fraudulently concealed" by Mercedes during the divorce action. Monique's litigation against Mercedes, which survived four different pleadings to September 2008, when Mercedes' motion to dismiss and/or for judgment on the TAC was granted, is the basis for the instant malicious prosecution action.

*Action Performance Acquires Most of JHI's Assets and Trademarks and Monique Obtains a Preliminary Injunction*

In September 2002, Jeff and his mother engaged in several transactions on behalf of JHI and themselves. First, under an asset purchase agreement, Action Performance Companies, Inc. (APC) purchased most of JHI's assets, and assumed a $1,116,122.88 debt to Mercedes, JHI's sole shareholder. (See also *Bohbot II, supra*, 2005 WL 237234, at p. *2) In a trademark purchase agreement, JHI also sold and assigned the four new trademarks and one of the four original Jeff Hamilton trademarks to Jeff Hamilton Collection, Inc. (JH Collection), an APC subsidiary of which Jeff was president.

Monique sought a preliminary injunction to freeze these transactions and prevent further dissipation of community assets. In support of this motion, Monique submitted a November 27, 2002 declaration in which she stated there

7

could be "no question that the 'Jeff Hamilton' enterprise is a community asset. In this regard, it was I who conceived the 'Jeff Hamilton' name, because at the time [Jeff] bore a resemblance to the actor George Hamilton. Indeed, our 1987 tax return . . . identifies [Jeff]'s occupation as 'Executive,' and my occupation as 'Product Design.'"

The court granted the motion and issued a preliminary injunction on December 4, 2002, freezing the proceeds of the sale to APC, and ordered Jeff and Mercedes to hold them in trust. The court also enjoined the transfer, encumbrance or concealment of any proceeds pending further order.

In May 2003 in an action concerning the sale of real property located at 2433 South Grand Avenue in Los Angeles, Mercedes stipulated to the issuance of a preliminary injunction, which the trial court approved, requiring that all proceeds due her from the sale of that property be placed in the same blocked account. In October 2003, the court ordered that all proceeds from the September 2002 agreements be deposited into a blocked account and ordered Mercedes to provide an accounting of all Jeff Hamilton product manufactured, sold, distributed or otherwise transferred after the September 2002 agreements.

*Monique Joins APC and JH Collection.*

In March 2004, Monique filed a first amended complaint for joinder against Mercedes, APC and JH Collection. She alleged that the trademarks sold in the 2002 trademark purchase agreement between JHI, APC and JH Collection included community property, sold without her consent and for less than the trademarks' reasonable value. Monique alleged that she had a 50 percent ownership interest in the trademarks, and a right to receive income generated from them and their associated goodwill.

8

*APC and JH Collection Sue in Federal Court*

In June 2005, APC and JH Collection filed a federal court action against Jeff, JHI, Mercedes and others (the district court action). The gravamen of that action was that the defendants were alleged to have committed fraud in entering into the September 2002 transactions by failing to disclose that, in its 2001 decision in *Bohbot I*, the California Court of Appeal found that Jeff committed fraud in his divorce proceeding.

*Summary Judgment is Entered in Favor of APC and JH Collection on the Second Amended Complaint*

Monique filed a second amended complaint for joinder (SAC) against Mercedes in February 2006. APC and JH Collection remained named defendants in the SAC but Monique sought no specific relief against either defendant. In due course, the trial court granted summary judgment in favor of APC and JH Collection on the ground that they had purchased the trademarks at issue "for fair and reasonable value."

*Trial Regarding Valuation of Trademarks*

In July 2006, the trial court found that the date of valuation of the Jeff Hamilton trademarks deemed community property in *Bohbot I* was July 2, 1993. A trial to determine the value of those trademarks and any associated goodwill was conducted in October and November 2006.

Twice Jeff and Mercedes moved to dissolve the preliminary injunction and have the SAC dismissed against Mercedes. The trial court denied the motions, but granted Monique leave to amend to file the operative third amended complaint

(TAC). In the TAC, Monique sought: (1) a declaration that Mercedes was Jeff's "financial straw person and/or alter ego"; (2) a declaration that funds Mercedes received from the sale of the Grand Avenue property and the new trademarks were received solely for Jeff's benefit; (3) a declaration that Mercedes held title to certain real properties solely for Jeff's benefit; (4) a declaration that any monetary judgment entered against Jeff should also be entered against Mercedes; (5) an accounting by Mercedes; and (6) the imposition of a constructive trust over all properties and revenues generated by the four new trademarks.

On March 14, 2007, the court issued an intended statement of decision valuing the original Jeff Hamilton trademarks at $451,457 as of July 1993, and found Monique entitled to half that amount.

*Judgment is Entered—and Later Vacated—in the District Court Action*

In a judgment entered on April 18, 2007, the district court found Jeff and JHI to be one another's "alter egos," and awarded $1.5 million to APC and JH Collection. The district court also entered judgment in favor of and awarded Mercedes $114,495 on her counterclaim against APC and JH Collection.

In January 2008, pursuant to a stipulation between the parties, the district court vacated the portion of its April 20, 2007 judgment finding Jeff and JHI to be one another's alter egos. In March 2008, the district court denied Monique's request to intervene in that action in order to obtain an order preserving the preclusive effect of its since–vacated April 2007 alter ego judgment. Monique did not seek appellate review of that denial.

10

*Mercedes' Motions for Judgment on the Pleadings and to Dismiss the TAC*

Meanwhile, in September 2008, following the trial court's trial on valuation of the trademarks, Mercedes filed a motion to Dismiss and/or for Judgment on the TAC. She argued that she could not be liable as her son's alter ego because one individual cannot act as another's alter ego. She also argued that Monique had not alleged and could not allege a claim of fraudulent transfer between Mercedes and Jeff. Initially, this motion was denied. However, the trial court limited Monique from proceeding against Mercedes on anything other than a UFTA claim premised on APC's September 2002 payment of $1,116,122.88 to Mercedes to purchase the assets of JHI.

After the district court partially vacated its April 2007 judgment, Mercedes renewed her motion to dismiss the TAC and/or for judgment on the pleadings as to the TAC, on the ground that Monique could not establish the requisite elements of a UFTA claim.

On September 29, 2008, the trial court issued a statement of decision granting Mercedes' motion to dismiss and/or for judgment on the TAC. The trial court explained that:

> "The theory underlying Monique's [UFTA] claim is that: (a) [Jeff] is the alter ego of JHI; (b) the [APC] Payment [of $1,116,122.88 in September 2002] to Mercedes was to extinguish JHI's debt to Mercedes; (c) in light of the alter ego relationship between Jeff and JHI, the debt extinguished by the [APC] Payment may be considered to be Jeff's debt; and (d) the [APC] Payment was therefore a transfer that benefitted Jeff.

> "The foregoing theory is predicated on the finding in the April 20, 2007 Judgment [in the district court action] . . . that Jeff and JHI were the alter egos of each other . . . .

> "Pursuant to an order entered on January 23, 2008, . . . the [district court] vacated the portions of [its April 2007] Judgment that had included the Alter Ego Finding. [¶] . . . [¶]

11

"Monique has not presented sufficient evidence that the [APC] Payment in September 2002 . . . was made with intent to defraud pursuant to Civil Code section 3439.04.

"The [APC] Payment was to extinguish a scheduled debt of JHI to Mercedes, which debt apparently reflected either: (a) a loan by Mercedes to JHI; or (b) a distribution to which Mercedes, as JHI's sole shareholder, would have been entitled, but that she forwent.

"Monique has not presented sufficient evidence . . . of any lack of reasonably equivalent value in exchange for JHI's obligations to Mercedes . . . .

"Monique has had ample time to assemble evidence to support a fraudulent transfer claim and has not shown that the claim is viable.

"Because Monique has not presented sufficient evidence to establish a viable claim against Mercedes, the Court grants Mercedes' Motion . . . , and judgment shall be entered in favor of Mercedes on the [TAC]."

Monique appealed. On October 20, 2010, the Court of Appeal affirmed the judgment, putting the divorce action to rest. (*Bohbot IV, supra,* at pp. 13-18.)

*Mercedes sues Monique for Malicious Prosecution*

In December 2011, Mercedes filed this malicious prosecution action. The trial court bifurcated and ordered the element of probable cause tried first. After extensive briefing, the court found that Mercedes failed to demonstrate that Monique lacked probable cause to initiate and prosecute an action against Mercedes. The court found that the preliminary injunction Monique obtained in 2002 constituted sufficient evidence of probable cause to sue Mercedes, and Mercedes had not shown that Monique obtained the preliminary injunction as a

result of fraud or perjury.  Judgment was entered in favor of Monique.  This timely appeal followed.

## DISCUSSION

1.    *Malicious Prosecution Law and the Standard of Review*

Because of its potential chilling effect on citizens' willingness to report criminal conduct or sue on civil disputes, and an "antipathy for litigation spawning litigation" (*Brennan v. Tremco, Inc*. (2001) 25 Cal.4th 310, 315), the tort of malicious prosecution "has traditionally been regarded as a disfavored cause of action."  (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 872 (*Sheldon Appel*); *Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 817 (*Wilson*).)  As a result, "the elements of the tort have historically been carefully circumscribed so that litigants with potentially valid claims will not be deterred from bringing their claims to court by the prospect of a subsequent malicious prosecution claim."  (*Sheldon Appel, supra*, 47 Cal.3d at p. 872.)

"A plaintiff in a malicious prosecution action 'must plead and prove that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination in . . . plaintiff's favor [citations]; (2) was brought without probable cause [citations]; and (3) was initiated with malice [citations].' [Citation.]"  (*Paiva v. Nichols* (2008) 168 Cal.App.4th 1007, 1018 (*Paiva*); *Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP* (2010) 184 Cal.App.4th 313, 333 (*Franklin Mint*).)  The question whether there was an absence of probable cause to bring the prior case is a question of law to be determined by the court from facts established in the case.  (*Sheldon Appel, supra*, 47 Cal.3d at p. 875; *Paiva, supra,* 68 Cal.App.4th at p. 1018.)

13

"The presence or absence of probable cause is viewed under an objective standard applied to the facts upon which the defendant acted in prosecuting the prior case. [Citation.] The test . . . is whether any reasonable attorney would have thought the claim to be tenable. [Citation.] This 'less stringent' standard [citation] is based upon the *Flaherty* test (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637) for determining frivolous appeals, and 'more appropriately reflects the important public policy of avoiding the chilling of novel or debatable legal claims' [citation]." (*Paiva, supra,* 168 Cal.App.4th at pp. 1018–1019; see also *Franklin Mint, supra*, 184 Cal.App.4th at p. 333 [probable cause determination does not consider defendant's subjective mental state; if underlying claim was objectively tenable, malicious prosecution action fails without regard to evidence of malice on defendant's part].) In short, probable cause exists unless all reasonable attorneys would agree that an action was completely devoid of merit. (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 743, fn. 13.)

The sole issue before us is whether Monique lacked probable cause to initiate and maintain an action against her former mother-in-law after the divorce action was reopened on remand after *Bohbot I*. The threshold showing here is purposefully set quite low: "Plaintiffs and their attorneys are not required, on penalty of tort liability, to attempt to predict how a trier of fact will weigh the competing evidence, or to abandon their claim if they think it likely the evidence will ultimately weigh against them. They have the right to bring a claim they think unlikely to succeed, so long as it is arguably meritorious." (*Wilson, supra,* 28 Ca1.4th at pp. 822; see also *Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 927.)

Probable cause to pursue a civil claim does not hinge on the claim's merit, as such, but upon it being arguably tenable, viz., not so completely lacking in arguable merit that no reasonable attorney would think it was tenable. (*Paiva,*

14

*supra,* 168 Cal.App.4th at p. 1019.) Probable cause exists if the claim is legally sufficient and can be substantiated by competent evidence. (*Id*. at p. 1021.) In the context of the probable cause element of malicious prosecution, initiating an action "'requires evidence sufficient to prevail in the action or at least information reasonably warranting an inference there is such evidence.'" (*Arcaro v. Silva & Silva Enterprises Corp.* (1999) 77 Cal.App.4th 152, 156.) If a litigant possesses competent evidence to substantiate a legally cognizable claim for relief, she commits no tort by asserting that claim, even if she is also aware of the existence of evidence weighing against the claim. The plaintiff is not required, on penalty of tort liability, either to attempt to predict how the trier of fact will weigh competing evidence or to abandon her claim even if she or her counsel believe the evidence will ultimately weigh against her.

2.      *Monique had Probable Cause to Sue Mercedes*

This malicious prosecution action arose out of an extremely contentious and vigorously litigated divorce action. Mercedes became enmeshed in that litigation after Monique succeeded in re-opening the dissolution action as to the couple's 1990 settlement by virtue of the decision in *Bohbot I*. In that decision, the court found that Jeff committed extrinsic fraud by concealing specific trademarks associated with his clothing line. (*Id*. at p. 13.)

A.      *Preclusive Effect of the Preliminary Injunction*

In July 2002, Monique joined Mercedes to the family law action and, in December 2002, obtained a preliminary injunction to prevent dissipation of community assets. In granting the injunction, the trial court was persuaded by Monique's argument that Mercedes had, in effect, acted as an "alter ego" or "straw

15

person" for Jeff. The court froze distribution of any proceeds from the September 2002 transactions between JHI and Action Performance, and those funds remained in a blocked account for the duration of Monique's action against.

Monique insists Mercedes cannot satisfy her burden to demonstrate an absence of probable cause to bring or maintain an action against her, because the existence of probable cause was definitively established by virtue of the court's issuance of a preliminary injunction on the merits. She argues that even though she ultimately failed to prevail against Mercedes, the trial court's decision to grant a preliminary injunction, constitutes a "[c]laim[ ] that . . . succeeded at a hearing on the merits" for the purpose of establishing probable cause. (See *Wilson, supra*, 28 Cal.4th at p. 818.) We agree. Other courts have embraced this view and held that issuance of a preliminary injunction conclusively establishes that an underlying suit was brought with probable cause. (See e.g., *Fleishman v. Superior Court* (2002) 102 Cal.App.4th 350, 356–357 (*Fleishman*) [trial court's issuance of a preliminary injunction establishes probable cause to defeat subsequent claim of malicious prosecution]; *Paiva, supra*, 168 Cal.App.4th at pp. 1011, 1022 [defendant may negate element of probable cause to defeat malicious prosecution claim by showing that interim victory in underlying case—such as granting of preliminary injunction in favor of malicious prosecution defendant—established probable cause].)

### B. *The Fraud Exception*

Mercedes contends that the trial court erred in finding that Monique had a legally tenable basis upon which to initiate or continue an action against her because the preliminary injunction was supported by fraudulent evidence and cannot, as a matter of law, amount to probable cause. "The principle that a

16

favorable interim ruling on the merits will establish probable cause is subject to an exception in instances in which that ruling was procured by fraud or perjury perpetrated by the plaintiff (the malicious prosecution defendant). [Citation.]" (*Paiva, supra*, 168 Cal.App.4th at pp. 1025–1026; *Wilson, supra*, 28 Cal.4th at p. 820; *Fleishman, supra*, 102 Cal.App.4th at p. 357.)

Mercedes insists that Monique could not have drawn her into the reopened dissolution action nor obtained a preliminary injunction had she not made misrepresentations to the court in *Bohbot I* that Jeff fraudulently concealed his interest in JH Design and the Jeff Hamilton trademarks. Mercedes argues that Monique knew about Jeff's interest in JH Design long before she sought to reopen the divorce proceeding following the 1999 $1 million settlement between Jeff and Elkouby. Specifically, Mercedes points to declarations submitted by Monique in 1994 and 1996 in which she stated that, in negotiating the 1990 settlement, she and Jeff "discussed that [Jeff] was half owner of [JH Design]." Mercedes also points to 1996 deposition testimony in which Monique acknowledged a conversation she had with Elkouby regarding her understanding that he and Jeff "were 50/50 percent partner[s]." And, at a deposition in 2013, Monique reaffirmed that she knew in 1989 and 1990 that Jeff was a half owner in JH Design Group.

Mercedes argues that, notwithstanding these acknowledgments, in seeking to reopen the dissolution action, Monique misrepresented to the trial court in 1999 that she did had not known of Jeff's ownership interest in JH Design. In a declaration in support of her petition to reopen the dissolution action, Monique claimed she had agreed to the 1990 property settlement in reliance on Jeff's "sworn declaration . . . that Jeff Hamilton was financially unsuccessful and resulted in millions of dollars of losses, and that [Jeff] owned no interest whatsoever in JH

17

Design." The trial court found there was no basis upon which Monique was entitled to equitable relief.

The appellate court disagreed, but not for the reasons advanced by Monique. Indeed, that court never reached the question whether Monique had been aware of Jeff's interest in JH Design. (*Bohbot I, supra*, at p. 13 ["we need not decide whether Jeff disclosed the existence of a community property interest in JH Design or concealed facts materially affecting its value"].) Instead, the reversal in *Bohbot I* was premised entirely on the court's conclusion that there was evidence Jeff concealed trademarks that "were community property, and that his failure to disclose the existence of those community assets constituted extrinsic fraud." (*Ibid*.) In short, the decision directing the court to reopen the dissolution action was expressly not related to Monique's alleged misrepresentation that she was unaware of Jeff's interest in JH Design. Rather, the *Bohbot I* court focused only on the trademarks, the existence of which it found Jeff had concealed from his wife Monique, and expressly stated that it was not deciding "whether Jeff disclosed the existence of a community property interest in JH Design or concealed facts materially affecting its value." (*Ibid*.)

Nevertheless, Mercedes argues that the appellate court's decision to reopen the dissolution action was premised on fraud because Monique failed to disclose to that court that she had known about the trademarks at issue, a fact she admitted only once Mercedes was joined to the action. Mercedes points to a declaration Monique submitted to the trial court in November 2002 in which she stated: "there can be no question that the 'Jeff Hamilton' enterprise is a community asset. In this regard, it was I who conceived of the 'Jeff Hamilton' name, because at the time [Jeff] bore a resemblance to the actor George Hamilton. Indeed, our 1987 tax

18

return . . . identifies [Jeff]'s occupation as 'Executive,' and my occupation as 'Product Design.'"

Mercedes insists this statement constitutes an admission that Monique knew about the trademarks all along because, as the originator of the Jeff Hamilton trade name and a "Product Designer" for the company, she had to have known the trademarks existed and may have been involved in their creation. Mercedes maintains that, had the court in *Bohbot I* known about this evidence, it would not have found that Jeff engaged in extrinsic fraud and would not have ordered the divorce action reopened, thereby providing Monique a chance to pull Mercedes into the litigation.

We do not agree that Monique's November 2002 declaration is the damning admission Mercedes makes it out to be. It makes no reference to trademarks at all. Rather, it addresses only the fact that Monique suggested use of the Hamilton name because of Jeff's resemblance to an actor, and mentions her nonspecific role in Product Design at some point in 1987. Based solely on this limited information it would be unreasonable to impute knowledge of trademarks to Monique based on this declaration.

The trial court never determined whether Monique's November 2002 declaration amounted to an admission that she knew of the trademarks' existence. Even if that statement constitutes the "telling" admission Mercedes now claims it was, it was insufficient to establish that the preliminary injunction was obtained as a result of fraud or perjury. As Mercedes acknowledges, the trial court was aware of and considered this declaration at time it granted Monique's application for a preliminary injunction, so this was neither new or pivotal evidence. Further, in addition to the declaration, the parties could have presented the court with the record considered by the court in *Bohbot I* when it decided to reopen the

dissolution proceeding; they chose not to do so. As a result, the trial court appropriately found that Mercedes failed to meet her burden to show that Monique obtained the preliminary injunction as a result of fraud or perjury.

## DISPOSITION

The judgment is affirmed. Monique shall recover her costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, Acting P. J.


We concur:



MANELLA, J.



COLLINS, J.